**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| **IN RE TELLIUM, INC.** | : | Civil Action No. 02-cv-5878 (FLW) |
| **SECURITIES LITIGATION** | : | |
| | : | **OPINION** |
| | : | |

**APPEARANCES:**

For Plaintiffs:

> Lite DePalma Greenberg & Rivas, LLC
> Joseph J. DePalma
> Katrina Blumenkrants
> Two Gateway Center, 12th Floor
> Newark, NJ 07102

For Defendants:

> McCarter & English, LLP
> Andrew T. Berry
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102
> Attorneys for Defendants Tellium, Inc., Richard W. Barcus, Harry J. Carr, Michael M.
> Connors, Jeffrey A. Feldman, Edward F. Glassmeyer, Michael J. Losch, William A.
> Roper, Jr., and Richard C. Smith, Jr.

> Latham & Watkins, LLP
> Keena M. Mackay
> One Newark Center
> Newark, NJ 07101-3174
> Attorney for Defendant Morgan Stanley

> Kirkpatrick and Lockhart, LLP
> Anthony P. LaRocco
> Sherry D. Williams
> The Legal Center, One Riverfront Plaza, Seventh Floor
> Newark, NJ 07102
> Attorneys for Defendants Thomas Weisel Partners LLC and William B. Bunting

**WOLFSON,** District Judge:

Presently before the Court are the second round of motions to dismiss the instant action, filed by Tellium, Inc. ("Tellium" or the "Company"),[1] Harry J. Carr ("Carr"), Michael J. Losch ("Losch"), Richard W. Barcus ("Barcus"), Michael M. Connors ("Connors"), Jeffrey A. Feldman ("Feldman"), Edward F. Glassmeyer ("Glassmeyer"), William A. Roper, Jr. ("Roper"), and Richard C. Smith, Jr. ("Smith") (collectively, "Tellium Defendants"); Thomas Weisel Partners LLC ("TWP"), and William B. Bunting; and Morgan Stanley.  Plaintiff's Second Consolidated and Amended Class Action Complaint ("SAC") again alleges violations of §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, respectively; Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## I.        BACKGROUND

The Court will assume the parties' familiarity with the instant action, and incorporates the facts as set forth in its Memorandum Opinion of March 31, 2004 ("March 31 Opinion"), dismissing in its entirety Plaintiff's First Consolidated and Amended Class Action Complaint ("FAC"), with leave to amend.[2]  The SAC seeks to address the pleading deficiencies pursuant to Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA") that led to the

---

[1]In November 2003, Tellium, Inc. merged with Zhone Technologies, Inc., pursuant to which Zhone became a wholly-owned subsidiary of Tellium.  After the merger, Tellium was renamed Zhone Technologies, Inc.  Tellium Defendants' Brief at n.1; Plaintiffs' Brief at n.1.

[2]Rather than challenge Plaintiffs' proposed SAC, all Defendants consented to the filing of a SAC, and reserved their rights to challenge the SAC  through motions to dismiss.

dismissal of the FAC.  In response to the Court's mandate that Plaintiffs provide more specific details of the Defendants' actions with respect to the allegedly fraudulent registration statement, and fraudulent representations following the IPO, the SAC does not add new allegations, but rather seeks to expand upon those already alleged.  The Court will therefore limit its discussion of the facts to the supplementary allegations, and the facts needed to contextualize these supplementary allegations.[3]

**A.**     **Tellium's Pre-IPO Knowledge of The Collapse of Its Customer Base**

Plaintiffs allege that Tellium went forward with its IPO on May 17, 2001, despite a downturn in the telecommunications market, based on the purported strength of three contracts with Tellium's three main customers, Qwest Communications International, Inc. ("Qwest"), Cable & Wireless ("C&W"), and Dynegy Global Communications ("Dynegy").  Each of these contracts required an extensive evaluation, testing and product qualification process, which required the substantial participation of Tellium's sales, marketing, engineering and training staff.  SAC ¶ 46.  Sales efforts at Tellium generally involved a team that included a sales engineer, a network engineer, and a systems engineer.  Id.

Plaintiffs have interviewed several individuals to lend support to their allegations that at the time of the IPO, Tellium knew about the change in needs and expected purchases of its three major customers.  First, with respect to C&W, Plaintiffs allege that one of the potential underwriters of the IPO at Credit Suisse First Boston ("CSFB") has stated that by October 2000,

_____

[3]The SAC continues to name Winslow Management Company and Roberto Vitalini as Lead Plaintiffs, who do not have standing with respect to claims under § 11, as held in the March 31 Opinion.  See ¶ 24.  These allegations shall be stricken from the SAC.

-3-

C&W "at the time was rumored to be freezing capital expenditures which was at the front end of any of the big players to do that." ¶ 50. Plaintiffs state that a network engineer who had been laid off by C&W in May 2001 confirmed that C&W's business started to slide in "mid-Fall of 2000." Id.

Plaintiffs also allege that with respect to Qwest, a "Tellium senior systems engineer who had originally reviewed Qwest's technical roadmap and estimated that it had called for 30-40 switches noted that it changed when the 'market tanked.'" ¶52. Plaintiffs attempt to date the tanking of the market as prior to May 2001 through a former Tellium sales vice president who had been involved in Qwest's original contract negotiations, and who left Tellium just prior to the IPO. The sales vice president stated that the Qwest contract was "real" until the bottom of the market fell out, which "started earlier" than 2001, but that in 2001 "the pieces got so small from the explosion that there just wasn't much left." Id.

Tellium allegedly began communicating these shifts in customer demand in January 2001 to existing and potential suppliers including Solectron, with which it subcontracted to manufacture most of the parts for its switches. ¶ 54. A Solectron manager stated that orders fell drastically from January 2001 through May 2001 because Tellium's "business was going down." Id. A former Tellium employee responsible for buying raw materials and services also stated that Tellium's forecasts for its sales were cut back in the first quarter of 2001, and because Tellium did not have excess inventory, its purchases of supplies were cutback in accordance with its customers' forecasted requirements. ¶ 55. Another former Tellium employee, who was responsible for transitioning products from development to manufacturing, stated that Tellium returned, or pushed back, a substantial amount of components and materials by the time he left

Tellium in April 2001, including 1000 to 2000 JDS Uniphase high-speed interfaces worth about $10,000 each. ¶ 56.

**B.      Qwest Contract and Kickback Allegations**

**1.      September 2000 Qwest Contract**

As discussed in the March 31, 2004 Opinion, Qwest entered into a three-year contract with Tellium in September 2000 for a minimum purchase of $300 million of Tellium products.  In the version of the contract filed with the Securities and Exchange Commission ("SEC") on October 10, 2000 as part of the IPO registration materials, which was later incorporated into the Registration Statement, the descriptions of the relevant purchases and delivery milestones were redacted.

Plaintiffs allege that the only concrete purchase information provided in the contract was that Qwest had agreed to make purchases for a defined, redacted dollar amount by certain milestone dates, including December 31, 2002 (the "Second Milestone").  They further allege that because of the redactions of dollar amounts and delivery dates, the public was could not ascertain what Qwest agreed to purchase.  ¶ 63.  Plaintiffs state that although Qwest may have initially intended to make substantial purchases from Tellium, the unredacted versions of the contracts demonstrate that the contract commitments were unenforceable in the event that the conditions at Qwest changed and Qwest decided not make purchases from Tellium, which actually came to pass.  Id.

Without aid of the contract itself, Plaintiffs allege that a CSFB executive who declined to underwrite the IPO, and who was familiar with the unredacted version of the Qwest contract, concluded that it contained many "out clauses."  Id.  A former Tellium engineer stated that "the

-5-

contract was mainly for the all-optical switches which were not developed yet." Id.  A former

Tellium employee in finance stated that Qwest could easily "get out of those contracts" because

they contained a technical superiority clause.  Id.  Finally, a former director of Corporate

Development who had been involved in the negotiation of the September 2000 contract stated that

"wiggle room" had been included in the contract because "once Nicholas DeVito became

involved in the negotiations he added contract provisions that 'allowed them [Qwest] the

opportunity to sort of step out if Tellium didn't hit its release program for certain programs.'"  Id.

## 2.    Qwest Contract Renegotiation

Plaintiffs allege that because of the sharp decline in its business beginning in the fourth

quarter of 2000, Qwest no longer needed the additional capacity provided by Tellium's switches.

¶ 67.  Thus, in order to keep Qwest's business, Plantiffs allege that Carr, a personal friend and

neighbor of Qwest CEO Joseph Nacchio, and Mark McCoy, a consultant hired by Tellium in

October 2000 with connections to senior Qwest executives, conducted contract renegotiations on

behalf of Tellium.  Id.  Tellium's vice president of sales, who had worked on the initial contract,

allegedly was specifically excluded from the negotiations, as were members of Tellium's

engineering and administrative staff, in contrast to usual practice.  Id.

As a result of the renegotiation, the purchase agreement was amended to remove, *inter*

*alia*, Qwest's obligation to make defined dollar purchases in 2002.  Plaintiffs allege that a former

network engineer familiar with the terms of both Qwest contracts has stated that the amended

purchase agreement, dated April 20, 2001, removed Qwest's obligation to make defined dollar

purchases by December 31, 2002.  ¶ 68.  This redaction was allegedly material because it would

have cast doubt on Qwest's intention to make significant purchases in the near future, as well as

on the reliability of Tellium's revenue guidance for 2002.

**3.     Qwest Needs**

_____In order for Qwest to support the "next generation all optical broadband Internet network," that would "significantly reduce operative costs and provide customers with unprecedented capacity at a lower cost," as was touted in a Tellium September 20, 2000 press release, a telecommunications company of Qwest's size and complexity would need to purchase a large number of switches to create the needed "mesh architecture."  ¶ 65.  Plaintiffs state that in its initial "technical roadmap" with Tellium, Qwest planned to purchase 30-50 switches, but wound up placing only small orders for a few "bottom-end" or bare bones switches, raising red flags among Tellium employees as to what Qwest was actually doing with Tellium products.  A former Tellium employee involved in business development and pricing stated:

> Qwest has a huge network and for Qwest you need, you know, probably a good 40 to 50 switches to make a big difference in their worldwide, or in their U.S. network alone.... So, if they only bought a handful of switches, maybe five switches, and unless they actually deployed them in a particular region in an X, then they really weren't running, tending to run a nationwide network.... If you are really intending to run a nationwide mesh network, you've got to buy a lot of switches.  To mesh.  To get all the efficiency out of it.  So the joke was that, well they must be deploying those in warehouses, because they can't possibly be putting them in their network if they bought as little as they bought.  ¶ 65.

**4.     Kickback Allegations**

Plaintiffs reallege the grant of 333,333 shares of friends and family stock and two million warrants to Qwest executives in September 2000, and that the exercise price of the warrants was lowered from $15 to $14 a share with an additional 375,000 warrants issued to a Qwest affiliate at $14 a share, as consideration for renegotiating the contract.  ¶ 66, 69.  Plaintiffs further allege that upon information and belief, senior Qwest executives and directors were issued stock options with

a $3.05 exercise price, and that these options and/or stock were received as a *quid pro quo* or

"kickback" for the renegotiated contract and the limited purchases of Tellium products that Qwest

did not need.  ¶ 70.

In its recent SEC filings, Tellium has disclosed investigations by the SEC and the United

States Attorney in Denver, Colorado into potential kickbacks paid by up to eleven Qwest vendors,

including Tellium, to senior Qwest executives and directors.  ¶ 70(b).  By letter to the Court dated

November 5, 2004, Plaintiffs requested that the Court take judicial notice of the resolution of the

SEC investigation.  On October 21, 2004, the SEC announced that it had charged Qwest with

securities fraud and other violations of the federal securities laws.  In addition, the SEC

announced that, without admitting or denying the allegations in the SEC complaint, Qwest had

consented to the entry of a judgment that enjoined Qwest from violating the federal securities

laws, and directed Qwest to pay a civil penalty of $250 million.  SEC v. Qwest Communications

Int'l Inc., Civ. No. 04-z-2179 (OES) (D. Colo) ("SEC Complaint"); SEC Litigation Release No.

18936 ("Litigation Release").  The Court will judicially notice these documents.

The paragraphs of the SEC Complaint most relevant to the instant action are ¶¶ 181-189.

In these paragraphs, the SEC alleges that because of its huge capital expenditure budget and status

as a "marquee" player in the telecommunications industry, "Qwest enjoyed tremendous leverage

over small telecommunications equipment and service vendors between 1999 and 2001."  SEC

Complaint ¶ 181.  It further alleges that "[i]n many cases, a commitment to purchase equipment

or services by a high-profile company such as Qwest was essential to the success of a vendor's

initial public offering ("IPO")."  Id.

According to the SEC Complaint, Qwest allegedly refused to do business with vendors

unless they allowed Qwest and members of its senior management to invest in those vendors shortly before or at the time of their IPOs, with one Qwest engineer allegedly stating "[Y]ou have to pay to play." SEC Complaint ¶ 182.  Qwest's investments typically took the form of a pre-IPO warrant, or option; senior managers usually invested through the vendor's "friends and family" program.  SEC Complaint ¶ 183.  Qwest senior management "demanded and negotiated" the investment opportunities, and in return agreed to buy hundreds of millions of dollars of equipment that Qwest did not need and knew would not be deployed in its network.  SEC Complaint ¶¶ 184, 185.

The SEC Complaint lists Tellium as the prime example of such an arrangement: "For example, Qwest committed to buy $400 million of equipment from Tellium, Inc., even though Qwest engineers had not identified any use for that equipment in Qwest's network.  Much of the useless equipment that Qwest bought was sold for scrap at pennies on the dollar while much of it sits idle in warehouses." SEC Complaint ¶¶ 186, 187.

Plaintiffs also cite several press reports that appear to refer to the arrangement between Qwest and Tellium.  A *Wall Street Journal* article from October 10, 2003 discusses the Denver grand jury investigation into "whether telecommunications company Qwest Communications International improperly made deals with small telecom-gear suppliers," and that according to persons "familiar with the investigation," it was looking into "small equipment companies' practice of awarding so-called friends-and-family shares to Qwest senior executives, some of whom may have had influence over Qwest's equipment-buying decisions."  SAC ¶ 70(c)(i).  A *Denver Post* article from October 13, 2003 reported that Qwest executives received stock from suppliers, and that in late 2002, Qwest had asked the law firm Wilmer, Cutler & Pickering to do

an internal investigation.  ¶ 70(c)(ii).  The internal investigation revealed that "certain Qwest

executives inadvertently reviewed deals with companies that had provided them stock."  Id.  A

November 10, 2003 *Business Week* article reported the following:

> A former CEO of a telecom equipment startup who requested anonymity said that while trying to sell the company gear in 1999, the startup offered Qwest shares in its upcoming IPO.  But instead of earmarking the stock for the company, a senior Qwest exec gave the vendor a list of 11 Qwest insiders who should receive the shares.  "It was a whole bunch of people trying to make millions," says the former CEO, who was interviewed recently by the federal investigators.
>
> Moreover, gear that Qwest ultimately bought from suppliers playing the stock game often wound up collecting dust in warehouses, according to six former Qwest managers and engineers.  Indeed, Qwest engineers say they referred in jest to such gear as "flower pots." At the time, they questioned whether management's stock positions had improperly influenced the purchasing decisions.
>
> ¶ 70(c)(iii).

Plaintiff further cites a former financial advisor to Qwest's senior executives, who states

that he was "90% sure" that Tellium gave stock and/or other compensation to Qwest executives

including Philip Anschutz, Chairman; Joseph Naccio, CEO and Director; Lewis Wilks, President

of internet and multi-media markets; Afshin Mohebbi, another President; and Marc Weisberg,

Senior Vice President for Corporate Development.  ¶ 70(a).  This person further stated that, in the

case of Weisberg:

> "There certainly was a side deal.  At the time, he was planning on leaving Qwest, and as a sort of back door thing, Tellium said we're going to put you on our Board in six months or whatever the time period was... Even aside from the shares itself, he was certainly promised a benefit."
>
> Id.

**5.    Qwest Restatements**

In March 2004, Qwest filed a restated 2001 Form 10-K, which stated that "several of our

directors are directors of or are otherwise associated with or have investments in companies with which Qwest or its directors and employees may do business (including purchase products or services) from time-to-time.  ¶ 70(d).  Qwest also filed a restatement in March 2004 that noted that revenues for 2000 and 2001 had been inaccurately reported; that it had actually been incurring significant losses by fourth quarter 2001; and that revenues were overstated because the accounting techniques that had been used prematurely recognized future sales of its excess optical network capacity.  ¶ 70(e).

7.    **Additional Information Demonstrating Lack of Legitimate Purpose**

Plaintiffs allege additional information indicating that Qwest's purchases did not have the earmarks of a legitimate purchase.  A former Tellium project manager explained that major telecommunications companies would normally play with equipment in the lab to ensure that it can interoperate with their network and their equipment, then certify the company, and then do a field trial, before they actually buy the equipment.  ¶ 71(a).  Qwest, by contrast "just bought it–which was a little funny, everybody kinda thought that was strange, a little collusive."  This project manager came to Tellium from AT&T "thinking it would be a smaller company and better but the corruption was disgusting.  That company was filthy."  Id.  He further stated that Carr told employees that he would get into a lot of trouble if they didn't get the warehoused equipment connected up.  Id.  This employee stated that the Qwest network was called the "warehouse network."  Id.

A former Tellium employee in charge of customer deployments for Qwest and Dynegy asserted that Carr had encouraged Qwest to accept four systems worth $5-6 million each that Qwest did not need before the consummation of the IPO so that Carr could refer to these sales

during the IPO roadshows. ¶ 71(b).  He stated that these four systems were delivered to a Qwest warehouse in Texas; that after the IPO, nine additional systems were delivered to a Qwest warehouse in Edison, New Jersey; and that theses deliveries could be confirmed by Tellium shipping invoices.  Id.  He stated that as of  2002, these systems remained uninstalled, and that Carr and Mark McCoy, among other people at Telium, referred to the Qwest deliveries as purchases for the "warehouse network."  Id.  Several other former Tellium employees, including a former Director of Operations and Marketing Manager, confirmed that Tellium's products were being deployed to warehouses.  ¶ 72.

## C.    Contract Redactions in the Extant/Dynegy and C&W Agreements

Plaintiffs allege that the redacted September, 1999 Extant/Dynegy contract filed with the SEC excluded the delivery dates and general targets, quantities, and prices of the purchased products.  ¶ 57.  They similarly allege that the redacted September, 2000 C&W contract omitted delivery dates and prices that would have enabled investors to determine whether the contract called for purchase of products that had yet to be successfully developed.  ¶ 59.  Plaintiffs allege that because the contracts limited C&W's liability to payment for "those systems that have been accepted and delivered to the purchaser" and certain portions of "accepted purchase orders," C&W was able to avoid any minimum purchase commitment, leaving Tellium without recourse. ¶ 59, 60.

The former Director of Corporate Development at Tellium has stated that by the time of the IPO, and for fourteen months prior, Tellium was unable to obtain any purchase orders from C&W.  ¶ 61.  He stated that "[t]here was never any consideration in the Cable and Wireless deal. No orders ever came.  It was the first contract I ever saw that never got an order."  Id.  A former

Tellium employee in investor relations, who doubted that there was a meaningful purchase order from C&W, stated that "there were a lot of attempts to get things done to sort of, get them to take some equipment because people had doubts that– meant anything– after quarter after quarter had gone by and nothing had been sold to them."  ¶ 60.

Because no sales revenue from C&W had been recognized by Tellium from the September 2000 contract date through the end of 2002, and no purchase orders had been issued, Plantiffs believe that it may be inferred that agreements on specifications, forecasts, and purchase orders had not materialized by May 17, 2001, and that Tellium therefore had no basis to "expect" deliveries to C&W to occur within the next 7 months, as was represented in the Registration Statement.  ¶ 61.  They further assert that Tellium's consent in December 2002 to terminate the contract, rather than seeking to enforce any contract commitments, demonstrates the lack of an enforceable agreement.  ¶ 61.

**D.      Revenue Guidances**

Plaintiffs allege that the financial model used to price the IPO, which was also used in later revenue guidances, was not based upon numbers taken from the three contracts, sales forecasts, purchase orders, or information provided in planning meetings.  The former Tellium employee who developed the financial model used to price the IPO stated that the numbers were developed using arbitrary growth assumptions that were extrapolated using an Excel spreadsheet:

> If you know anything about Excel, how Excel works, you know equals A1 times 1.15 and extrapolate that out.  That basically became your $144 million.  If you look at the model that they kind of threw out there and just do some basic math, you'll see it was just like a 15% increase quarter over quarter from the initial model.

> ¶ 73.

This employee prepared the financial model for the IPO in December 2000.  ¶ 74.  He further stated that after developing the $144 million revenue estimate for 2001, Tellium continued to use that model, with higher percentage growth assumptions for later years.  Id.  This employee reported to Losch, and furnished the financial models and guidances to him.  Id.

**E.    Additional Class Period Allegations**

The SAC contains a few additional allegations of material misstatements made during the class period.  In July 2001, when concerns about the telecommunications industry and Tellium in particular were surfacing, Carr made a keynote presentation in which he addressed "the reports in the press about the so-called glut in bandwith."  ¶ 102.  Carr stated that the "reality is that there is strong demand for bandwith."  Id.

Tellium issued a press release on July 18, 2001 reporting the highlights of its second quarter 2001 performance.  ¶¶ 95, 103.  In that release, Carr described Tellium in the press release as a "real company shipping real products to real customers."  Id.  The press release also stated that Qwest expanded its multi-year strategic relationship with Tellium, and affirmed the $288 million revenue estimate for 2002.  ¶ 103.  The next day, in an interview with CNBC News, Carr stated that the Qwest, C&W, and Dynegy contracts were the "basis for us to feel... confidence that we could go out and go public this year, even in the current market environment."  ¶¶ 95, 104.  Carr indicated during that interview that the $1 billion worth of contracts would last a long time, and that Tellium had raised revenue guidances the night before.[4]

---

[4]     Interview transcripts reflect the following:

Haines:  And how long would a three bill– how long would a – a $1 billion worth of business last you?
Carr:  Well, to put it in perspective, in – on our earnings call last night, we just

## II.     DISCUSSION

Pursuant to Fed. R. Civ. P. 12(b)(6), a court may dismiss a claim "for failure to state a claim upon which relief can be granted" if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The inquiry is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims. Id. (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In deciding a 12(b)(6) motion, courts must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Id. (citing Scheuer, 416 U.S. at 236). Nevertheless, courts are not required to credit bald assertions or legal conclusions alleged in the complaint. Id. (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997)). Similarly, legal conclusions draped in the guise of factual allegations do not benefit from the presumption of truthfulness. Id. (citing In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001)).

In deciding Defendants' Motion to Dismiss, the Court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of Plaintiffs' claim. Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004). A document forms the basis of a claim if it is "integral to or explicitly relied on in the complaint." Id., citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Matters

---

raised guidance for this year from about $104 million to a range of $125 million to $135 million. So, obviously, even if we do that, there's still a lot left on that $1 billion.
¶ 104.

-15-

of public record upon which the Court may rely include SEC filings, even if those filings are not relied on in the complaint, In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002), and the price of publicly-traded securities, Ieradi v. Mylan Lab., Inc. 230 F.3d 594, 600 n.3 (3d Cir. 2000).

## A.    Section 11 of the Securities Act

Plaintiffs again assert § 11 liability against each of the Defendants in the instant action.[5] Under § 11, liability is imposed against enumerated persons, without regard to intent, for false or materially misleading statements or omissions contained in the registration statement as of the date that the registration statement became effective.[6]  Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).  Plaintiffs must also allege that the allegedly omitted facts existed, and were known or knowable at the time of the IPO.  Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc., 68 F. Supp. 2d 480, 487-88 (D.N.J. 1999).

## 1.    Applicability of Rule 9(b)

---

[5]Section 11 of the Securities Act provides in pertinent part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue –
> > 1.  every person who signed the registration statement;
> > 2.  every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;...
> > 3.  every underwriter with respect to such security.

15 U.S.C. § 77k(a).

[6] The Registration Statement at issue in this case became effective May 17, 2001, the day of the IPO and the first day of the Class Period.  See ¶ 1.

-16-

As discussed in the March 31 Opinion, although plaintiffs generally need not plead fraud, reliance, motive, intent, knowledge or scienter to state a claim under § 11, when such claims are "grounded in fraud," they must be pled with particularity pursuant to Fed. R. Civ. P. 9(b).  Shapiro v. UJB Fin. Corp. 964 F.2d 272, 288 (3d Cir. 1992).  Failure to meet the threshold pleading requirements mandated by Rule 9(b) supports dismissal separate and apart from Rule 12(b)(6). California Public Employees' Retirement System v. Chubb Corp., 394 F.3d 126, 156 (3d Cir. 2004) ("CalPERS").  Plaintiffs argued in their opposition to the prior round of motions to dismiss that because they had not made any specific allegations of fraud against the outside director Defendants or Morgan Stanley, Plaintiffs should not have to plead their claims with particularity as to those Defendants pursuant to Rule 9(b), but rather were only required to plead a "short and plain statement of the claim," pursuant to Fed. R. Civ. P. 8(a).  However, Plaintiffs made no attempt in the FAC to differentiate their claims against these Defendants from the fraud claims that pervaded the FAC, and which were not clearly levied against specific Defendants.[7]  As such, the Court held that for the purpose of that round of motions, Plaintiffs' claims against all Defendants would be subject to the heightened pleading requirements of Rule 9(b).

Plaintiffs again assert in the SAC that their § 11 claims against the Outside Director[8] and Underwriter Defendants,[9] this time including TWP, are based solely in negligence, and indeed are

---

[7]See, e.g., "Various individual defendants and at least one of Tellium's lead underwriters, Thomas Weisel Partners LLC ("Thomas Weisel"), were highly motivated to misstate Tellium's true business relationships in order to successfully consummate the IPO and to sustain Tellium's stock price at artificially inflated levels thereafter."  FAC ¶ 12.  See also FAC ¶ 101.

[8]The Outside Director Defendants are comprised of Connors, Feldman, Roper, Smith, Glassmeyer and Bunting.

[9]The Underwriter Defendants include Morgan Stanley and TWP.

stated as a separate count within the SAC.  ¶¶  9, 138-148.  Plaintiffs allege that Outside Directors

and Underwriters were negligent in the performance of their duties of due diligence to investigate

the allegedly untrue and misleading facts asserted in the Registration Statement, ¶ 9, 142, 145, for

signing the Registration Statement, ¶ 141, and for participating in the issuance of the Registration

Statement, ¶ 144.  Plaintiffs further specifically allege that as to these Defendants, with the

exception of TWP, they are making no allegations of scienter, and do not allege that their

misconduct was knowing or reckless.  ¶ 9.  Plaintiffs assert scienter on the part of TWP only in the

period following the IPO.  Id.  By contrast, Plaintiffs assert that the Management Defendants[10]

knew, or were reckless in not knowing, the allegedly false information contained in the

Registration Statement.  ¶ 11.

Where § 11 claims are sufficiently compartmentalized into claims that sound in fraud, and

claims that sound in negligence, only the claims that sound in fraud will be subjected to the

heightened pleading requirements of Rule 9(b).  See Rombach v. Chang, 355 F.3d 164, 178 (2d

Cir. 2004) (subjecting to Rule 9(b) plaintiffs' claims against individual defendants that sounded in

fraud, but not their claims against underwriter defendants that sounded in negligence, where the

complaint alleged that the underwriters owed a "duty to make a reasonable and diligent

investigation of the statements contained in the prospectus."); In Re Atlas Air Worldwide

Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004) (holding that claims against

underwriter and other individual defendants for failure to conduct a reasonable investigation and

lack of reasonable grounds for belief that registration statements were not misleading, sounded in

negligence).  See also In re Cendant Corp. Litig., 60 F. Supp.2d 354, 364 (D.N.J. 1999) (declining

---

[10]The Management Defendants consist of Carr, Barcus, and Losch.

to subject § 11 claim limited to negligence to Rule 9(b) even though plaintiffs also asserted § 10(b) claims against defendants); cf. CalPERS, 394 F.3d at 164 (3d Cir. 2004) (admonishing Plaintiffs who, in the Second Amended Complaint "neglected to make even a single adjustment to the Amended Complaint to avoid having their section 11 claims subjected to Rule 9(b)" but instead "regurgitated the exact same one-sentence disavowal of fraud that the District Court had already rejected as insufficient.")

Because "Rule 9(b) refers to 'averments' of fraud," the Court is required to "examine the factual allegations that support a particular legal claim." Shapiro, 964 F.2d at 288.  The Court finds that the SAC  far more thoroughly carves out the scope of the § 11 claims against the Outside Director and Underwriter Defendants, as opposed to the one line, blanket disclaimer contained in the FAC.  Plaintiffs assert 1934 Act claims against only Tellium, Carr, Losch, Barcus and TWP, and acknowledge that Rule 9(b) applies to their § 11 claims against Carr, Losch and Barcus. Although, as the Tellium Defendants argue, the negligence of the Outside Director Defendants is necessarily predicated on the allegedly fraudulent conduct of the Management Defendants, the SAC does not make any allegations that the Outside Director Defendants engaged in fraudulent conduct.

With respect to TWP, Plaintiffs' 1933 and 1934 Act claims are not based on a unified course of fraudulent conduct, in contrast to the claims against Carr, Losch, and Barcus for false and misleading statements made both before and after the IPO.  Rather, Plaintiffs allege § 11 liability against TWP solely for failure to conduct due diligence as to the facts contained in the Registration Statement, and for taking part in the issuance of the Registration Statement.  ¶¶ 144, 145. Furthermore, Plaintiffs' § 10(b) and Rule 10b-5 claims against TWP allege liability based on

statements made by TWP after June 2001, statements that do not relate to its conduct preceding the IPO.  ¶ 176.

Finally, Morgan Stanley's argument that Plaintiffs' claims against it should be subjected to Rule 9(b), although Plaintiffs have not asserted a § 10(b) claim or made any scienter allegations against Morgan Stanley, is unavailing.  Morgan Stanley points to Plaintiffs' allegation that it published a false and misleading research report on June 14, 2001, which contained Tellium's "baseless revenue guidances," as support for its contention that Plaintiffs' allegations against it are based in fraud. ¶ 99.  However, that section of the SAC also discusses a very similar June 13, 2001 report published by UBS Warburg, which it claims was false and misleading because it contained the revenue guidances and statements regarding the contract commitments of Tellium's three customers.  ¶ 98.  UBS Warburg, however, is not even named as a Defendant in this action.  The Court finds that the statements contained in this section of the Complaint are directed at Tellium's continued distribution of "its baseless revenue projections internally and to market analysts" which "fostered the false impression that the guidances reflected expected purchases under the three contracts," ¶ 96, rather than making any allegations against the market analysts who also had functioned as underwriters for Tellium's IPO.

The Court is cognizant of the somewhat anomalous result created by a rule that allows claims against fraudulent actors to be dismissed because plaintiffs fail to plead the allegations of fraud with the required particularity, but which allows plaintiffs to proceed with claims against actors who negligently fail to discover the fraud.  However, because the Court believes that to be the result that is required by the law, it will analyze whether Plaintiffs' § 11 claims have satisfied Rule 9(b) with respect to Tellium and the Management Defendants, and whether they have

satisfied the requirements of Rule 8(a) with respect to the Outside Director Defendants and Underwriter Defendants.

## 2.      Relaxation of Rule 9(b) Requirements

The March 31 Opinion held that the strict requirements of Rule 9(b) can be relaxed if Plaintiffs can show that the factual information tending to demonstrate the details of an alleged fraud are within the "exclusive" control of the Defendants.  Shapiro, 964 F.2d at 285; In re Rockefeller, 311 F.3d at 216 (application of Rule 9(b) may be relaxed where factual information is "peculiarly within the defendant's knowledge or control").  Plaintiffs arguing for a relaxed application of Rule 9(b) based upon their inability to obtain the information needed to plead with particularity must "delineate at least the nature and scope of [their] efforts to obtain [such information]."  Shapiro, 964 F.2d at 285.  Plaintiffs, however, were not entitled to a relaxation of Rule 9(b) based on the allegations set forth in the FAC, as they failed to accompany their boilerplate statement that information was in Defendants' exclusive control with a statement of facts upon which that assertion was based.

Plaintiffs submit that they still have not been able to obtain certain pertinent information despite substantial investigative efforts, but have sufficiently specified in the SAC what information was unavailable and Plaintiffs' efforts to obtain it, such that they should be entitled to a relaxed application of Rule 9(b).  Plaintiffs state that although they were "unsuccessful in their efforts during a very substantial investigation to obtain copies of the Tellium contracts in unredacted form, several interviewed persons, including from Credit Suisse First Boston who ultimately declined to pursue a [sic] participation in Tellium's IP, directed Plaintiffs to the terms of the unredacted contracts to see that the supposed purchase 'commitment' included in the contracts

were not, as a practical matter, firm and enforceable." ¶ 14.  Plaintiffs also allege that direct

evidence of the illicit kickback agreements, and documents relating to customer requirements,

forecasts, future sales and delivery information, purchase orders, shipping invoices, and other

records relating to deliveries and installation efforts, are in the exclusive control of the participants.

¶¶ 16, 48, 72.

Plaintiffs identify, by job title, approximately fifty persons who were contacted to obtain

relevant information, and state that they were unable to contact current Tellium employees or

senior Qwest executives in light of ethical obligations.  ¶ 130.[11]  Plaintiffs assert that they asked

approximately a dozen persons for unredacted copies of the three contracts, and no one with access

to copies was able to produce them voluntarily; they further assert that they do not have subpoena

power to demand the production of the contracts or other documents that would contain many of

the details of Tellium's transactions.  ¶¶ 131, 132.[12]  Finally, Plaintiffs state that most former

_____

[11]"Persons interviewed include former employees of Tellium, including systems engineers, a field engineer, systems engineering director, customer support engineer network engineers, a training center manager, a senior technical trainer, product marketing and communications managers, marketing directors, a project management director, a testing and manufacturing manager, a sales manager, a vice president of sales, a business development vice president, a corporate communications director, a media relations director, an industry analyst relations manager, an applications manager, a materials director, account manager, product manager, program manager, a financial analysis manager, a quality assurance director, an internal quality auditor, an operations director, a corporate development director and an investors' relation director. Plaintiffs also interviewed employees and/or former employees of three investment banks, including Thomas Wiesel [sic] Partners who were involved in, or considered, the underwriting of Tellium's IPO, an investment advisor to Qwest executives, a Solectron manager, a marketing director at a Tellium competitor, a former Cable & Wireless employee, and Qwest consultant." ¶ 130.

[12]Plaintiffs state that these documents include "customer purchase orders, meeting agendas, correspondence, planning meeting notes, shipping invoices, e-mails and in [sic] advisory board minutes."  ¶ 132.

Tellium employees had signed a confidentiality agreement that included a non-disparagement claim, and therefore stated that they did not wish to have their names disclosed.  ¶ 133.

The Tellium Defendants argue that Plaintiffs are not entitled to a relaxed application of Rule 9(b) because the facts that are essential to Plaintiffs' case are not peculiarly and exclusively within the Tellium Defendants' control.  For example, former and present employees and agents of Dynegy, C&W, and Qwest would be able to provide information regarding the nature and extent of their employers' past requirements, and then-forecasts as to future requirements, and would have access to documents containing sales and delivery information, purchase orders, and other records relating to installation of Tellium equipment.  Although the SAC refers to an interview with one former C&W employee, it does not allege that Plaintiffs contacted and interviewed anyone from Qwest or Dynegy.[13]  Moreover, the Tellium Defendants argue that Plaintiffs do not provide an explanation as to why they have not submitted a FOIA request to obtain the unredacted contracts from the SEC, nor do they describe the positions of the dozen people who they asked for unredacted versions of Tellium's contracts.

Courts have refused to relax the application of Rule 9(b) where third parties or government agencies possess information that plaintiffs allege are within the defendants' exclusive control. See Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 566 (6th Cir. 2003); United States ex rel. Russell v. Epic Healthcare Mgm't Group, 193 F.3d 304, 308 (5th Cir. 1999) (plaintiff who argued

---

[13]The Tellium Defendants note that although Plaintiffs submit an explanation for their failure to contact "senior" Qwest executives, they do not suggest that they were unable to contact other Qwest employees.  Plaintiffs do paraphrase one former Qwest employee as stating that 40-50 switches would be required for Qwest to obtain the efficiencies of a "mesh," but do not list this employee in ¶ 130 as among the individuals interviewed.  In that paragraph, Plaintiffs state that they interviewed a "Qwest consultant" but any specific information provided by this consultant appears nowhere in the SAC.

documents were in defendants' exclusive control was not entitled to relaxed application of Rule 9(b) in action brought under the False Claims Act where documents containing the requisite information were possessed by other entities, such as the Healthcare Financing Administration); Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994) (declining to relax application of Rule 9(b) in RICO case where plaintiffs had "as much access as the defendants to the customers who can flesh out the circumstances" of the alleged fraud.)

The Court finds that most of the factual details necessary to support Plaintiffs' allegations could have been obtained from third-party sources.  Plaintiffs' argument that they did not have subpoena power to obtain the relevant documents is irrelevant, as there is "no general right to discovery upon the filing of [a] complaint." Yuhasz, 341 F.3d at 566.  Plaintiffs do not specifically allege that they attempted to obtain copies of the contracts from individuals at C&W, Dynegy or Qwest, and were refused, or that they attempted to obtain these documents from the SEC. Plaintiffs' statement that the purchase orders, forecasts, and other records relating to the delivery and installation of Tellium products are within the exclusive control of the Defendants is simply implausible; the three customers almost certainly would have such documentation.  However, the Court is sensitive to the fact that the details of the alleged kickbacks between Qwest and Tellium would be within the exclusive control of the Defendants, and senior Qwest executives under the representation of counsel, so as to that particular set of allegations only, the Court will relax the requirements of Rule 9(b).

**3.      Adequacy of Plaintiffs' Allegations In Support of Their Section 11 Claim**

**a.      Allegations of Negligence Against the Outside Director and Underwriter Defendants**

Even in the absence of the heightened pleading standard imposed by Rule 9(b), in order to

-24-

state a § 11 claim, Plaintiffs are required to allege material misrepresentations or omissions based upon the facts as they existed at the time of the offering.  In re Mobilemedia Sec. Litig., 28 F. Supp.2d 901, 924 (D.N.J. 1998).  See also Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 316, 323-324 and n.5 (D.N.J. 2000) ("Castlerock II") (noting that plain statutory language of § 11 requires that "the registration statement contain a material misstatement or omission 'when such part became effective'").  As already mentioned, to state a claim under § 11, plaintiffs must plead facts demonstrating that allegedly omitted facts existed, and were known or knowable by the Defendants at the time of the offering.  Id. at 323.

The Registration Statement provides that C&W had a minimum purchase commitment of $350 million pursuant to its contract with Tellium, and that Tellium expected to commence commercial shipment to C&W during the second half of 2001.  The Registration Statement further provides that Tellium expected that "Dynegy Connect will purchase approximately $250 million of products under the contract, although it has no obligation to do so," and that Qwest had "a minimum purchase commitment of $300 million over the first three years" of a five-year contract, which was "subject to extensions under a limited circumstance, an additional $100 million over the following two years of the contract."  Plaintiffs allege that these and other statements in the Registration Statement, including cautionary language, were untrue statements and/or the Registration Statement omitted details demonstrating that these commitments and the purported purchase expectations were false.

Plaintiffs' allegations that Tellium received forecasts and planning information from its customers three to four quarters in advance of deliveries; that Tellium held regular discussions with customers every four months for the customers' needs for the next six to twelve months; that

Tellium's knowledge of information resulted in inventory "push backs" to Tellium's vendors and cancellations of purchase orders for additional inventory; and Tellium's access to the unredacted versions of the contracts, are sufficient to state a claim under § 11 pursuant to <u>Fed. R. Civ. P.</u> 8(a) to maintain that these facts existed; were known *or knowable* by the Outsider Director and Underwriter Defendants at the time of the offering; and made the language of the Registration Statement misleading.

The Court therefore finds that Plaintiffs have stated a claim as to Count I of the SAC, but the claim will be limited as discussed in Part II.B.5, <u>infra</u>.

**b.      Allegations of Fraud against Tellium, Carr, Barcus, Losch, and TWP**

Rule 9(b) requires, at a minimum, that Plaintiffs support their allegations with all of the necessary factual background that would accompany "the first paragraph of any newspaper story," that is, the "who, what, when, where and how" of the relevant events.  <u>In re Rockefeller</u>, 311 F.3d at 217 (citing <u>Burlington Coat Factory</u>, 114 F.3d at 1422).  Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." <u>In re Rockefeller</u>, 311 F. 3d at 216 (quoting <u>In re Nice Systems</u>, 135 F.Supp. 2d at 577).  Moreover, Plaintiffs' allegations cannot survive a motion to dismiss based on a consideration of the totality of the pleadings.  Rather, each allegation must be examined by "compartmentalizing the evidence and wiping the slate clean after considering each component." <u>In re Westinghouse Sec. Litig.</u>, 90 F. 3d 696, 712 (3d Cir. 1996).  <u>See also</u> <u>Craftmatic Sec. Litig. v. Kraftsow</u>, 890 F.2d 628, 640 (3d Cir. 1990) (analyzing whether Plaintiffs stated a claim under § 11, § 12 and Rule 10b-5 by evaluating the complaint paragraph by paragraph).  Pursuant to Rule 9(b), although the

"circumstances constituting fraud or mistake shall be stated with particularity... intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

Plaintiffs' § 11 allegations in the SAC are substantially the same as those contained in the FAC, with additional details that Plaintiffs submit address the Court's prior ruling that the FAC was inadequately pled pursuant to Fed. R. Civ. P. 9(b). However, Plaintiffs have restructured their allegations, and now claim that the Registration Statement was misleading because it contained (1) untrue statements and misleading omissions regarding the risks associated with the IPO; (2) untrue statements and misleading omissions regarding Tellium's "overview" of its business; (3) untrue statements and misleading omissions regarding Tellium's "customers"; (4) untrue statements and misleading omissions regarding Tellium's "advisory board"; and (5) misleading omissions through the redactions of clauses in its customer contracts.[14]  ¶ 150.

These five items refer to specific language in the Registration Statement that Plaintiffs contend contains material misstatements or omissions based on the same seven sets of facts alleged in the FAC (to which additional allegations have been added in the SAC).[15]  In the SAC, Plaintiffs

---

[14]The Court would like to join the chorus of courts that has "repeatedly lamented plaintiffs' counsels' tendency to place the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (citations omitted). More egregious than the SAC itself, however, is Plaintiffs' abject failure to delineate, in their opposition brief, the new allegations from the old, leaving it to the Court to sift through 89 pages and 186 paragraphs of allegations in the SAC, and compare them to the 61 pages and 137 paragraphs in the FAC, in order to determine where the additional attempt at specificity lies. Plaintiffs' redundant, puzzle pleading style, and lack of attempt at clarification in the briefing, is manifestly unfair to the Court, particularly in light of the well-known strain on judicial resources.

[15]Plaintiffs reallege in the SAC that (1) Tellium did not have real commitments from its customers, ¶¶ 3, 6-8, 13-17, 58, 60-61, 63; (2) that the redactions to the three contracts were material, ¶¶ 4, 8, 57, 59, 62-63, 68; (3) that Tellium knew based on customer forecasts that the customers did not intend to purchase the amount of Tellium products stated in the Registration

additionally assert that the risk disclosures themselves were untrue or misleading.  Id.  Rather than
address the sufficiency of the allegations pursuant to Rule 9(b) by reference to these items, the
Court will address the sufficiency of the underlying allegations to which these paragraphs refer.[16]

Plaintiffs attempt to inject the particularity required by Rule 9(b) and the PSLRA into the
SAC, in large part, by substantiating their former allegations with statements made by confidential
sources.  In CalPERS, 394 F.3d at 146-47, the Third Circuit adopted the approach set forth by the
Second Circuit in Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) regarding the use of confidential
sources to provide particularized information.[17]  The Novak Court held that:

> [O]ur reading of the PSLRA rejects any notion that confidential sources must be
> named as a general matter.... [P]laintiffs need only plead with particularity *sufficient*
> facts to support those beliefs.  Accordingly, where plaintiffs rely on confidential
> personal sources but also on other facts, they need not name their sources as long as
> the latter facts provide an adequate basis for believing that the defendants'
> statements were false.  Moreover, even if personal sources must be identified there
> is no requirement that they be named, provided they are described in the complaint

---

Statement, ¶¶ 47-48, 57, 85(a); (4) that Qwest executives received kickbacks from Tellium, and
(5) were generally inconsistent with a bona fide relationship, ¶¶ 5, 15, 17, 45, 67-72; (6) that
Tellium developed its financial models with arbitrary growth assumptions, ¶¶ 18, 73-74 ; and (7)
that Tellium pushed back inventory and cancelled orders with its vendors, ¶ 12, 54-56.

[16]This is also the manner in which the issues have been briefed by the parties.

[17]CalPERS discussed confidential source information in the context of the PSLRA's
requirement that plaintiffs specify (1) each statement alleged to have been misleading; (2) the
reason or reasons why the statement is misleading and, (3) if an allegation regarding the
statement or omission is made on information and belief, the complaint shall state with
particularity all facts on which the belief is formed. 15 U.S.C. § 78u-4(b)(1).  The confidential
source information in the instant action is used to support Plaintiffs' § 10(b) and Rule 10b-5
allegations, which requires compliance with the PSLRA standard as discussed in Part II.B, infra,
as well as their § 11 claims.  The Third Circuit's reasoning regarding the use of confidential
sources to state a claim with particularity is similarly applicable to Plaintiffs' fraud-based § 11
claims requiring the application of Rule 9(b).  See CalPERS, 394 F.3d at 163 (rejecting
Plaintiffs' § 11 claims and noting that "[a]s detailed exhaustively in the preceding section,
Plaintiffs have not met their burden of pleading fraud with particularity").

with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

216 F.3d at 314 (emphasis in original).

The CalPERS Court, agreeing with Novak's reasoning that requiring disclosure of confidential sources serves no legitimate pleading purpose, but could have the effect of deterring informants from providing critical information in meritorious cases or inviting retaliation against these informants, held that a complaint could meet the pleading requirement by providing "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." Id. at 147. Where documentary evidence does not supply particularity, use of confidential sources assumes a "heightened importance." Id. at 148. Assessing the particularity of the allegations based on the use of confidential sources entails "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Id. at 147.[18]

In CalPERS, the Third Circuit held that the confidential sources relied upon by plaintiffs were, with few exceptions, not "described... with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." CalPERS, 394 F.3d at 148 (citing Novak). The Circuit found that, *inter alia*, (1) it was not apparent from the brief descriptions of many of the sources that they would possess the information alleged; (2) Plaintiffs did not allege how low level employees would possess the information alleged; (3) Plaintiffs did not allege whether the information was first or second hand; and (4)

---

[18]The Court notes that CalPERS was decided after the parties briefed the instant motions.

Plaintiffs did not adequately allege that the sources were employed by Defendant during the

relevant time period.  The Third Circuit contrasted the inadequate allegations in CalPERS with

those in In re Cabletron Sys., Inc. 311 F.3d 11, 21, 24, 30-31 (1st Cir. 2002), in which the plaintiff

pled that the former employees worked at the Company during the Class Period and had personal

knowledge of the practices they described.  CalPERS, 394 F.3d at 150 n.14.  In addition, it was

evident from the In re Cabletron complaint that the sources were "familiar with the activities

discussed, provided an abundant level of detail, and, significantly, that the sources ha[d] a strong

basis of knowledge for the claims they make."  Id.

i.      **Tellium's Pre-IPO Knowledge of The Collapse of Its Customer Base**

        Plaintiffs assert that the SAC adequately demonstrates Tellium's awareness that its

customers were affected by a pre-IPO downturn in the telecommunications and technology

markets, and submit statements of several confidential sources to establish Defendants' knowledge

of the collapse of its customer base.[19]  These allegations, which relate to the C&W and Qwest

contracts, are patently insufficient to add the required specificity to Plaintiffs' allegations:  among

many other things, it is unclear how the potential underwriter at CSFB knew about the alleged

---

        [19]As set forth more fully in Part I, supra, these statements include: the potential
underwriter at CSFB's statement that C&W was "rumored" by October 2000 to be freezing
capital expenditures; a former C&W network engineer's statement that C&W's business began to
slide in "mid-Fall of 2000"; the statement of a Tellium senior systems engineer that Qwest's
needs changed when the "market tanked"; the statement of a former Tellium sales vice president
who left Tellium prior to the IPO's completion that Qwest's initial contract, which he was
involved in negotiating, was real until the market conditions changed; a Solectron manager's
statement that orders fell drastically from January 2001 through May 2001 because Tellium's
business was going down; the statement of a former Tellium employee responsible for buying
raw materials and services that purchases were cut back based upon its own customers'
forecasted requirements; and the statement of a Tellium employee responsible for transitioning
products from development to manufacturing describing the return of 1000 to 2000 interfaces,
and the general "upheaval" that had occurred immediately before he left Tellium in April 2001.

capital freeze at C&W or why Plaintiffs have made no attempt to substantiate this "rumor"; how the network engineer knew about the general health of C&W; when the Tellium senior systems engineer believes the "market tanked"; how the sales vice president knew that Qwest's contract became "not real," or that Qwest's needs had otherwise changed, particularly in light of the fact that this person was excluded from the early 2001 contract renegotiation; how the Solectron manager knew that Tellium "business was going down," and moreover, how the alleged downturn specifically related to the three customers.

In addition, Plaintiffs make no attempt in the SAC to remedy the FAC's failure to provide *any* specificity with regard to the details of the forecasts that Tellium was supposed to receive.  The oft-repeated allegations that Tellium received forecasts from its three customers, ¶¶ 47-49, 57, 85(a), and that Carr sat "at the planning table," ¶¶ 12, 13, 47, 48, 83(a), 83(b), 85(a), 89(a), 89(b), 102, fare no better than they did before.  These allegations still suffer from the failure to plead who at Tellium received the forecasts, the information that the forecasts and updates provided, or other details indicating that Tellium knew that their customers' needs had changed as of May 17, 2001.[20] In addition, this lack of detail regarding the forecasts undermines the Tellium employee's statement that the forecasts led to a cut back in purchases, an allegation which also fails to answer

---

[20]By letter dated September 14, 2004, Plaintiffs submitted a September 1, 2004 decision from the Ninth Circuit in Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F. 3d 1226, 1231 (9th Cir. 2004), which they requested that the Court review as supplemental authority in opposition to Defendants' Motions to Dismiss.  Plaintiffs argue that this case stands for the proposition that knowledge can be demonstrated based upon "admissions by corporate officers that they had actual knowledge the sales projections were false."  The Court finds this case distinguishable from the instant action.  Indeed, the very same paragraph Plaintiffs quote from states that plaintiffs in that case had "hard numbers and make specific allegations regarding large portions of Oracle's sales data," demonstrating defendants' knowledge.  Plaintiffs here fail to submit anything that comes close to that level of detail.

to what extent purchases were cut back, and when.

Plaintiffs' allegation that Tellium knew that Dynegy was "well on its way to completing its build-out," ¶ 53, by the time of the IPO is unavailing.  Dynegy announced the completion of its United States communications network in October 2001.  <u>See</u> Certification of Daniel E. Loeb ("Loeb Cert."), Exh. E at 1.  Plaintiffs have not pointed to anything indicating that Tellium had knowledge of the United States build-out as of May 2001.  Moreover, the November 6, 2000 amendment to the Tellium-Extant/Dynegy contract attached to the Registration Statement states that:

> "Section 1 of the purchase agreement shall be deleted in its entirety and replaced with the following:
> (a)     Scope:... Dynegy Connect, L.P. and other Authorized Purchasers (as defined in Section 1(b) below), including but not limited to European Affiliates of Dynegy Inc., agree to purchase, and Tellium agrees to sell..."

<u>See</u> Loeb Cert., Exh. G at 1.

Thus, even if Tellium did have knowledge that Dynegy was close to completion of its United States network, in light of Dynegy's potentially substantial, if not *primary,* purchases from Tellium for its European network, such knowledge does not necessarily convey that Dynegy would only be making minor additional purchases from Tellium.  The Court therefore finds that Plaintiffs have not adequately pled knowledge of a pre-IPO downturn pursuant to <u>Fed. R. Civ. P.</u> 9(b).

**ii.     Qwest Kickback Allegations**

Plaintiffs allege that Tellium and Qwest never had an enforceable contractual relationship.  They allege that the initial September 2000 Qwest contract allegedly included "out clauses," including a technical superiority clause, and was mainly for products that had not yet been developed.  Plaintiffs also allege an extensive scheme between Tellium and Qwest, beginning in

the fourth quarter of 2000.  Plaintiffs support the notion of a scheme with allegations from (1) the

SEC investigation of Qwest and complaint charging Qwest with securities fraud and other

violations of the federal securities laws; (2) accounts of alleged Qwest wrongdoing as reported in

the press; and (3) March 2004 financial restatements indicating that Qwest directors were

associated with or had investments in companies with which it did business, and that 2000 and

2001 revenues had been inaccurately reported.

These details do not impute knowledge of a kickback scheme to Tellium prior to the IPO.

However, Plaintiffs do quote the former Tellium employee in charge of customer deployments for

Qwest and Dynegy as stating that Carr encouraged Qwest to accept four unneeded systems prior to

consummation of the IPO so that Carr could refer to these sales during IPO roadshows, and that the

four systems were delivered to a Qwest warehouse in Texas.  In addition, a former Tellium internal

quality auditor stated that the Qwest pre-IPO shipments were being sent to a holding place "for

appearances sake."  The Court notes that these statements do not contain nearly the level of

specificity that generally would be required under Rule 9(b), according to the Third Circuit in

CalPERS.   However, as noted in Part II.A.2, supra, Plaintiffs would be unable to obtain details to

state with particularity whether such a scheme existed because any information would be in the

control of the Defendants and Qwest senior executives, and the Rule 9(b) requirements would be

relaxed as to this allegation.

"[U]nder a relaxed application of Rule 9(b)...[p]laintiffs must accompany their legal theory

with factual allegations that make their theoretically viable claims plausible."  In re Burlington

Coat Factory, 114 F.3d at 1418.  The Court finds that Plaintiffs' allegations that the April 2001

contract renegotiations were conducted in a different manner than Tellium's usual practice, ¶ 67;

that prior to the IPO, Carr was encouraging Qwest to accept unneeded Tellium products in order to obtain investors, ¶ 71(b); and that shipments were being made to keep up the appearance of a legitimate contract, ¶ 72, are facts that make Plaintiffs claim of a larger kickback scheme between Tellium and Qwest that was in existence prior to the IPO "plausible."

The Court finds therefore finds that under a relaxed application of Rule 9(b), Plaintiffs have stated that the Registration Statement contained material misstatements or omissions as described in ¶ 88, 89(c), 91, and 93 to state a claim pursuant to § 11 as to Carr.  The Court finds that these allegations are insufficient to state a claim against Barcus and Losch, as Plaintiffs provide no details implicating them in the alleged scheme.

**iii.     Contract Redactions and Clauses**

The Court held in the March 31 Opinion that Plaintiffs failed to demonstrate how the contract redactions could be considered untrue statements or omissions of "material" information–"information that would be important to a reasonable investor in making his or her investment decision."  Oran v. Stafford, 226 F. 3d 275, 282 (3d Cir. 2000).  Undisclosed information is considered material "if there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor."  Id.

The Court finds that the added allegations with respect to the contract redactions do not alter its initial determination that the omitted information that would have allegedly enabled investors to better understand the contract was "material" information.  Investors in Tellium were aware that because of the redactions, they would not be able to evaluate the strength of the contracts based on information including delivery dates, quantities and prices of purchased

-34-

products, and whether the products covered by the contract were existing products or were yet to be developed.

Plaintiffs also allege that contract language limiting C&W's liability to "those systems that have been accepted and delivered to the purchaser" meant that as a practical matter, C&W could choose not to issue purchase orders and accept deliveries from Tellium.  The Tellium Defendants contend that the provision needs to be read in its proper context.  The provision is contained within the "Termination" section of the contract, and limits C&W's liability in the event that Tellium breached or terminated the agreement.  Pl. Exh. D. at 35.  The Court agrees with Defendants' reading of this provision, and therefore does not find that this allegation forms the basis of any material misstatements or omissions in the Registration Statement.

The Court therefore finds that the contract redactions and disputed provision of the C&W contract do not form a basis for Plaintiffs' § 11 claim pursuant to Fed. R. Civ. P. 12(b)(6).

### iv.    Revenue Guidances

The SAC alleges that the sales projections used to price the IPO, which were also used in later "revenue guidances," had no basis in the three major contracts, sales forecasts, purchase orders, or information provided in planning meetings, but rather were developed using arbitrary numbers that were extrapolated using an Excel spreadsheet.  Plaintiffs now allege that this information comes from the former Tellium employee who prepared the financial model for the IPO, and furnished the financial models to Losch.

The Court finds that Plaintiffs have properly alleged that the growth assumptions used to price the IPO were meaningless by quoting a confidential source who claims that he personally made up the growth assumptions.  However, Plaintiffs nowhere assert that these allegations,

contained in ¶¶ 73-74 of the SAC, form the basis of an untrue statement of material fact or misleading omission in the Registration Statement.  See ¶¶ 139, 150.  The Court therefore finds that the revenue guidances do not form a basis for Plaintiffs' § 11 claim pursuant to Fed. R. Civ. P. 12(b)(6).

**4.     Allegedly Misleading Risk Disclosure Language**

Plaintiffs state that the risk disclosure filed with the May 17, 2001 Registration Statement was misleading because it represented that the contractual commitments with Tellium's current customers were binding, and thus foreclosed C&W and Qwest from deciding not to purchase Tellium products without liability if the market dropped or business circumstances changed, which Plaintiffs allege already had happened.  By contrast, Plaintiffs contend that the true critical risk to Tellium's sales and revenues was disclosed in the prospectus filed as part of the original registration statement on September 22, 2000, and that the change in risk disclosure language demonstrates a material omission in the May 17, 2001 Registration Statement.

The September 22, 2000 disclosure states:

If our customers do not deploy our products... in a timely manner, or at all, we will have less revenues than we expect.  In addition, if our current or prospective customers decide not to purchase products from us for any reason, including if there is a downturn in their business, our ability to sell products and generate revenues would be seriously harmed.

¶ 75, Pl. Exh. A at 7.

Plaintiffs allege that the risk disclosure was changed in the Registration Statement, beginning with the second amendment dated November 7, 2000, to remove references to risks that "current" customers might not purchase products in the case of a "downturn in business" because the downturn in the industry had already begun.  ¶ 76.  The May 15, 2001 risk disclosure

amendment filed with the Registration Statement on May 17, 2001 states:

> We expect that substantially all of our revenue will be generated from a limited number of customers, including Cable & Wireless, Dynegy Connect and Qwest.  The termination or deterioration of our relationship with [our] customers will have a significant negative impact on our revenue and cause us to continue to incur substantial operating losses....
>
> If any of these customers elects to terminate its contract with us or if a customer fails to purchase products from us for any reason, we would lose significant revenue and incur substantial operating losses, which would seriously harm our ability to build a successful business....
>
> We are currently very dependent on three customers.  We must expand our customer base in order to succeed.  If we are not able to attract new customers who are willing to make significant commitments to purchase our products and services for any reason, including if there is a downturn in their businesses, our business will not grow and our revenue will not increase.

¶ 82, Pl. Exh. B at 6-7.

The Court does not discern any meaningful distinction between the different versions of the prospectus such that the "Risk Factors" statement in the May 17, 2001 Registration Statement alone is either untrue or omits material facts that would make the statement not misleading. Although the May 2001 version omits the word "current," and discusses the "downturn in business" with respect to potential customers, the May 2001 registration statement nowhere forecloses the possibility that, as stated in the September 2000, the three main customers could "fail[] to purchase products from us for any reason," and that if that occurred, Tellium "would lose significant revenue and incur substantial operating losses."  The cautionary language in the May 2001 statement has the same import as the language in the September 2000 statement.

The Court finds that Plaintiffs do not state a § 11 claim based on the change in risk disclosure language pursuant to Fed. R. Civ. P. 12(b)(6).

**5.**     **Bespeaks Caution**

In the March 31 Opinion, the Court declined to resolve whether the "bespeaks caution"

doctrine is an independent basis for the dismissal of Plaintiff's § 11 claims.  The bespeaks caution

doctrine provides that when "an offering document's forecasts, opinions or projections are

accompanied by meaningful cautionary statements, the forward-looking statements will not form

the basis for a securities fraud claim if those statements did not affect the 'total mix' of information

provided investors."  In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993).

Where "plaintiffs allege a document contains an affirmative prediction/opinion which is

misleading... the cautionary statements included in the document may render the challenged

predictive statements or opinions immaterial as a matter of law."  Id.  Morgan Stanley and the

Tellium Defendants again contend that the bespeaks caution provides an independent basis for

dismissal of Plaintiffs' § 11 claims.

Defendants assert that the Registration Statement copiously disclosed that investing in

Tellium presented major risks, including the risk that the three major customers might not purchase

the amount of Tellium products for which Tellium stated that it had contractual "commitments"

and purchase "expectations."  In addition to the "Risk Factors" section discussed in Part II.B.4,

supra, the Registration Statement also contains specific warnings regarding the Dynegy,[21]

---

[21]"Dynegy is proceeding with Extant's planned network build-out. Dynegy may, however,
change its plans at any time and determine not to proceed with the build-out on a timely basis or
at all. If Dynegy Connect were to stop or delay purchasing products or services from us, or
reduce the amount of products or services that it obtains from us, our revenue would be reduced.
In addition, although Dynegy Connect has agreed to purchase its full requirements for optical
switches from us until November 1, 2003, Dynegy Connect is not contractually obligated to
purchase future products or services from us and may discontinue doing so at any time. Dynegy
Connect is permitted to terminate the agreement for, among other things, a breach of our material
obligations under the contract." Pl. Exh. B. at 6.

C&W,[22] and Qwest[23] contracts.  Plaintiffs argue, however, that Tellium was aware by May 17, 2001 that C&W and Qwest were not "committed" to make $700 million worth of purchases

_____

"We expect Dynegy Connect will purchase approximately $250 million of products under the contract, although it has no obligation to do so." Id. at 44.

[22]"Under our agreement with Cable & Wireless, Cable & Wireless has made a commitment to purchase a minimum of $350 million of our optical switches by August 7, 2005. Our agreement with Cable & Wireless gives Cable & Wireless the right to reduce its minimum purchase commitment from $350 million to $200 million.  If we do not maintain a technological edge so that there exists in the marketplace superior technology that we have not matched. This agreement also permits Cable & Wireless to terminate the agreement upon breach of a variety of our obligations under the contract."  Pl. Exh. B at 6-7.

"Cable & Wireless is conducting laboratory testing of our Aurora Optical Switch at our facilities.  We expect to commence commercial shipment under this contract during the second half of 2001." Id. at 44.

"We are developing new products and enhancements to existing products. We may not be able to develop new products or product enhancements in a timely manner, or at all. For example, our Aurora Full-Spectrum switch depends on advancements in optical components, including micro-electromechanical systems, which have not yet been proven for telecommunications products. Any failure to develop new products or product enhancements will substantially decrease market acceptance and sales of our present and future products. Any failure to develop new products or product enhancements could also delay purchases by our customers under their contracts, or, in some cases, could cause us to be in breach under our contracts with our customers. Even if we are able to develop and commercially introduce new products and enhancements, these new products or enhancements may not achieve widespread market acceptance and may not be satisfactory to our customers. Any failure of our future products to achieve market acceptance or be satisfactory to our customers could slow or eliminate our revenue growth." Id. at 7.

The Registration Statement also noted that "[i]f our products do not operate within our customers' networks, installations could be delayed and orders for our products could be cancelled, causing our revenues to decline." Id. at 10.

[23]"Under our agreement with Qwest, Qwest has made a commitment to purchase a minimum of $300 million of our optical switches over the first three years of the contract and, subject to extensions under a limited circumstance, an additional $100 million over the following two years of the contract. This agreement allows Qwest, through binding arbitration, to terminate the agreement upon breach of a variety of our obligations under its contract."  Pl. Exh. B at 7.

-39-

because of the illusory nature of those contracts, and that Dynegy did not expect to make $250 million worth of purchases.  As such, they argue that the bespeaks caution doctrine simply does not apply here because the statements challenged by the Plaintiffs were not "forward looking," but rather were fraudulent warnings of future possibilities that had, as of May 17, 2001, already occurred.

   If the Registration Statement warned of events that had already occurred, the warnings contained therein would not sufficiently counter the alleged misrepresentations so as to render those misrepresentations immaterial as a matter of law.  See In re Westinghouse Sec. Litig., 90 F.3d 696, 709 (3d Cir. 1996) (holding that allegation that loss reserves were known to be insufficient under current economic conditions, and not merely that future economic developments might cause further losses, would assume actual significance to a reasonable investor contemplating the purchase of securities); P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."); Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir.1994) (reiterating view that "'[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'")(citation omitted); Milman v. Box Hill Sys. Corp., 72 F. Supp.2d 220, 230 (S.D.N.Y. 1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead

-40-

when he knows with near certainty that the Grand Canyon lies one foot away."); In re MobileMedia, 28 F. Supp.2d at 930.

The Morgan Stanley Defendants cite In re Numerex Corp. Sec. Litig., 913 F.3d 391 (E.D.Pa. 1996) as "involving facts and circumstances most similar to this case." Morgan Stanley Def. Reply Br. at 15 n. 10. The court in In re Numerex applied the bespeaks caution doctrine to dismiss a complaint in which the plaintiff alleged that the defendant had misrepresented or failed to disclose, among other things, that Numerex's relationship with its principal customer was "undergoing a re-evaluation and could result in delayed or declining sales." Id. at 398. The court held that "any reasonably prudent investor reading this prospectus would recognize the risks inherent in a company that depends upon one purchaser for almost half its sales." Id. at 399.

Here, any prudent investor who reviewed the substantial language in the Tellium prospectus indicating that a considerable amount of the three principal customers' expected purchases might not occur would have recognized the risks inherent in that investment. However, Plaintiffs here are alleging that the risk had already transpired. By contrast, in In re Numerex, the prospectus stated that the contract with the principal customer was about to expire, which the court found sufficiently warned investors that the contractual relationship was "undergoing re-evaluation"; the plaintiffs did not allege that the contract *had already* expired.

However, Defendants further contend that simply alleging, as Plaintiffs do, that the risks had already transpired is not sufficient. Defendants argue that where Plaintiffs have failed to plead with adequate particularity pursuant to Rule 9(b) that the risks identified in the Registration Statement had become historical facts by the time of the IPO, they have failed to demonstrate that the disclosures in the Registration Statement were not forward-looking, and that the bespeaks

caution doctrine should therefore be applied.  The Court agrees that for any claim requiring a Rule 9(b) analysis, Plaintiffs are required to plead with particularity that risks had already materialized in order to avoid application of the bespeaks caution doctrine.  To the extent that Plaintiffs are alleging that the Dynegy and C&W risks had already materialized, such allegations would be insufficient to preclude application of the bespeaks caution doctrine because the Court has rejected the basis for those arguments.  See Parts II.A.3.b.i and II.A.3.b.3, supra.

Because the Court has determined that a relaxed application of Rule 9(b) is appropriate with respect to the allegations surrounding the relationship with Qwest, however, and it has not been determined whether those risks had already materialized, the Court cannot find that the bespeaks caution doctrine sufficiently counters the alleged misrepresentations so as to render those misrepresentations immaterial as a matter of law.  Moreover, with regard to the Underwriter and Outside Director Defendants, against whom only negligence claims are being asserted, Plaintiffs are still required to plead with particularity that the risks discussed in the cautionary language had already materialized, in light of their averment that the Registration Statement was itself fraudulent.  As a result, the above analysis applies with equal force.

The Court therefore concludes that Plaintiffs' § 11 claims in Count II of the SAC are limited to allegations pertaining to the relationship with Qwest, and may be asserted solely as to Carr.  The § 11 claims against the Underwriter and Outside Director Defendants in Count I of the SAC are similarly limited to the allegations pertaining to the relationship with Qwest in light of the application of the bespeaks caution doctrine.

**6.      Control Person Liability**

To state a claim for control person liability under § 15 of the Securities Act, Plaintiffs must

allege (1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the violation.  In re Ravisent Tech., Inc. Sec. Litig., 2004 WL 1563024, at *15 (E.D.Pa. July 13, 2004).

Plaintiffs have stated a claim against Defendant Carr for a violation of § 11 of the Securities Act, and therefore have satisfied the first requirement.   To establish the second element, a plaintiff must demonstrate that "the defendant had actual power or influence over the allegedly controlled person."  In re MobileMedia, 28 F. Supp. 2d at 940 (citation omitted).  Carr's position as CEO, as well as his ownership of 6.6 million shares of Tellium stock, are sufficient to demonstrate "actual power" or "influence" over Tellium.   In re Ravisent, 2004 WL 1563024, at *15.   Finally, the Court finds that Plaintiffs have adequately asserted Carr's culpable participation in the § 11 violations.   As such, Plaintiffs have stated a claim against Defendant Carr under Count III.

## B.      Section 10(b) of the Exchange Act and Rule 10b-5

In the SAC, Plaintiffs assert claims against Defendants Tellium, Carr, Losch, Barcus, and Thomas Weisel under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs no longer assert § 10(b) and Rule 10b-5 violations against Outside Directors Glassmeyer and Bunting.  The Defendants have again moved to dismiss these claims based on failure to adequately plead material false misstatements or omissions and scienter pursuant to the Private Securities Litigation Reform Act ("PSLRA") and failure to plead loss causation.

Section 10(b) and Rule 10b-5 reach "beyond statements and omissions made in a registration statement or prospectus in connection with an initial distribution of securities and

create liability for "false or misleading statements or omissions of material fact that affect trading on the secondary market." In re Burlington Coat, 114 F.3d at 1417.[24]   To state a claim under § 10(b) and Rule 10b-5 in cases involving publicly traded securities and purchases or sales in public securities markets, Plaintiffs must allege (1) a material misrepresentation or omission; (2) scienter (3) in connection with the purchase or sale of a security; (4) reliance (or "transaction causation"); (5) economic loss; and (6) loss causation.  Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1631 (2005).

## 1.       Compliance with the PSLRA

Since claims brought under § 10(b) and Rule 10b-5 are fraud claims, Plaintiffs must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rockefeller, 311 F.3d at 216.  Allegations of securities fraud also must satisfy the specific pleading requirements of the PSLRA, 15 U.S.C. § 78u-4 et seq.  The PSLRA both supplements and supersedes Rule 9(b) by imposing additional, heightened pleading requirements

---

[24]Section 10(b) provides in pertinent part:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility or national securities exchange – . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered,  . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.  15 U.S.C. § 78j(b).

Rule 10b-5, in turn, makes it unlawful:
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

on claims of securities fraud.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir.

1999).  Under the PSLRA, a complaint alleging violations of § 10(b) and Rule 10b-5 must:  (1)

specify each statement alleged to have been misleading; (2) the reason or reasons why the

statement is misleading and, (3) if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which the belief is

formed.  15 U.S.C. § 78u-4(b)(1).

     In addition, under the PSLRA, the complaint must "state *with particularity* facts giving rise

to a *strong* inference that the defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2) (emphasis

added).  In Rule 10b-5 actions, this requirement supersedes the provisions of Rule 9(b) to the

extent that rule would otherwise permit state of mind to be averred generally.  In re Advanta, 180

F.3d at 531 n.5.   If a complaint fails to comply with the specific pleading requirements of the

PSLRA, dismissal of the complaint is statutorily mandated.  15 U.S.C. § 78u-4(b)(3)(A).

     A plaintiff may establish the requisite strong inference of fraudulent intent in one of two

ways:  (1) "by alleging facts establishing a motive and an opportunity to commit fraud"; or (2) "by

setting forth facts that constitute circumstantial evidence of either recklessness or conscious

behavior."  In re Advanta, 180 F.3d at 534-35.  Presumably in response to the Court's holding that

the allegations of motive and opportunity to commit fraud contained in the First Amended

Complaint were insufficient to establish scienter for the purpose of Plaintiffs' § 10(b) and Rule

10b-5 claims, the SAC does not contain any allegations related to motive and opportunity.  Instead,

Plaintiffs are now attempting to establish scienter solely through facts that constitute "strong

circumstantial evidence of conscious misbehavior or recklessness."  Id. at 534-35.

     A reckless statement is a material misstatement or omission "involving not merely simple,

or even inexcusable negligence, but an extreme departure from the standards of ordinary care" and "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id. at 535 (3d Cir.1999) (quoting McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir.1979)).  In addition, "generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."  Id. at 539.

Plaintiffs' § 10(b) and Rule 10b-5 claims for misleading statements and omissions contained in the Registration Statement, ¶ 159, and after the IPO, ¶ 160, are based on the exact same set of factual circumstances as its § 11 claims.  The allegations regarding the revenue guidances and kickback allegations merit further discussion, but the remainder of the allegations fail to comply with the particularity requirement of the PSLRA for the same reasons that they failed to meet the particularity requirement of Rule 9(b).

**a.      Revenue Guidances**

As noted by the Court in Part II.A.3.b.iv, supra, the Court found that the allegations regarding revenue guidances were sufficiently particular pursuant to Rule 9(b).  The Court finds that these allegations also sufficiently address the PSLRA's requirement that Plaintiffs allege the reason or reasons why a statement was misleading, and if the allegation regarding the statement or omission was made on information and belief, the facts upon which the belief was formed.  Plaintiffs quote the former employee who was personally developed the model that supported the $144 million revenue estimate for 2001, and the higher percentage growth assumptions for later years.  This employee directly reported to Losch, and furnished him with the financial models.  The Court finds that, because the claim is that the models were not based on anything other than multiplication using an Excel spreadsheet, it would be hard to be more specific than directly

quoting the source who claims that he made up the arbitrary guidances.  As such, the Court finds
that Plaintiffs sufficiently allege in ¶ 96 that all of the post-IPO statements that cite these numbers
are misleading.  These statements include ¶¶ 97, 98, 99, 103, 106, 109, 112, 113, 118, and 124.

As noted, Plaintiffs are also required to establish the scienter of the various Defendants
against whom they assert liability for these statements: Losch, Carr, TWP, and Tellium.[25]
Curiously, Plaintiffs repeatedly assert in their opposition brief that the scienter of the management
defendants can be established through the core business doctrine– which the Court thoroughly
rejected in the March 31 Opinion.   As discussed therein, courts that have applied the core business
doctrine have done so only where there were additional allegations give rise to a strong inference
of scienter as to a particular defendant.  See, e.g., Kennilworth Partners, L.P. v. Cendant Corp., 59
F. Supp. 2d 417, 428 (D.N.J. 1999) (“The Court recognizes that some courts have found that
allegations of scienter were sufficient based on individual defendants’ status as ‘senior officer,
directors and/or controlling shareholders,’ but the allegations passed muster only when ‘taken
together with... more specific allegations linking their positions to their knowledge.’”) (quotation
omitted).

The Court finds that Plaintiffs have sufficiently alleged scienter as to Losch, who is alleged
to have personally reviewed the prepared financial models and guidances.  Plaintiffs have also
alleged scienter as to Carr, who would certainly have had access to these guidances by virtue of his
position.  In re Cybershop.com Sec. Litig., 189 F. Supp.2d 214, 235-36 (D.N.J. 2002).  The Court
further finds that Plaintiffs have established scienter as to Tellium, because it has pled scienter as

---

[25]Plaintiffs have made no allegations that Defendant Barcus made any misleading
statements that are based on the allegedly arbitrary revenue guidances, and the Court therefore
need not discuss scienter with respect to him.

to Losch and Carr.  In re Campbell Soup Sec. Litig., 145 F. Supp. 2d 574, 597 (D.N.J. 2001).

Plaintiffs assert that because TWP "made affirmative statements to the market, and [was] in a position to confirm the truth of those statements, the failure to verify those statements before publication supports an inference of recklessness."  However, in order to support an strong inference of scienter, Plaintiffs are required to demonstrate more than TWP's failure to verify statements before publication.  Rather, Plaintiffs are required to allege facts indicating that TWP knew or should have known that its statements were false or misleading.  Novak, 216 F.3d at 309; P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp., 142 F. Supp.2d 589, 609 (D.N.J. 2001) (scienter adequately pleaded where "failure to investigate individual suspicious entries or failure to become familiar with some idiosyncratic aspect of CUC's business; rather, it is charged with reckless disregard of numerous-even hundreds-of unsupported entries").

The Court finds that Plaintiffs have failed to plead scienter as to TWP because it has not sufficiently alleged facts indicating that it had access to the model for the guidances, or other information indicating that the guidances were false or misleading.  Although they allege that TWP partner William Bunting sat on Tellium's board of directors, they have not alleged facts indicating that outside directors had access to the allegedly arbitrary financial model.  Moreover, Plaintiffs have specifically disclaimed Bunting's knowledge in order to proceed with its § 11 negligence claim, which is the only alleged basis for TWP's knowledge.  As such, the allegation that Bunting sat on Tellium's board of directors is insufficient to establish a "strong inference" of scienter as to TWP.

**b.**     **Kickback Allegations**

In light of the Court's finding that relaxed application of the Rule 9(b) standard was

appropriate, Plaintiffs were able to state a claim under § 11 with respect to the allegations

regarding kickbacks. There is no similar avenue that allows Plaintiffs to avoid the particularity and

scienter requirements of the PSLRA.  The kickback allegations underlying Defendants' alleged

misstatements do not meet the level of particularity required by the PSLRA.  Specifically, the

Court does not find that the confidential sources cited by Plaintiffs in ¶¶ 71-72 provide enough

detail with respect to, among other things, what the former employees' positions entailed and how

those positions provided a basis for the statements made, or the approximate dates that the events

that they allege transpired occurred.

The Court similarly finds that not enough detail is provided regarding the position of the

employee described in ¶ 65 to demonstrate the basis for his knowledge; the source of the

information contained in ¶ 67; or the basis that the "former financial advisor to Qwest's senior

executives" had for knowledge that Qwest management received shares and/or other consideration

from Tellium, and why he was only "90% sure." ¶ 70(a).  Although the information gleaned from

SEC proceedings could potentially be used to support first hand accounts, in the absence of

independent, particularized facts demonstrating contemporaneous knowledge, such allegations

amount solely to "fraud by hindsight," which has been "long rejected" in this Circuit.  CalPERS,

394 F.3d at 158.  The Court finds that the kickback allegations are insufficient to withstand the

requirements of the PSLRA.

### 2.    Loss Causation

A private plaintiff making a claim under § 10(b) and Rule 10b-5 must allege an economic

loss, and that the defendant's fraud caused the economic loss, also known as the "loss causation"

requirement.  Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1629 (2005) (citing 15 U.S.C.

§ 78u-4(b)(4)).[26]  In Dura, the Supreme Court clearly rejected the idea that, as held by the Ninth

Circuit, a plaintiff could sufficiently allege loss causation by stating that the price of the security on

the date of the purchase was inflated because of an alleged misrepresentation.  Id.[27]

Here, Plaintiffs attempt to allege loss causation by stating that they paid artificially inflated

prices for Tellium securities because of the misrepresentations of Defendants Tellium, Carr, Losch,

Barcus and TWP, and were damaged thereby.[28]  In Dura, the Supreme Court held that allegations

---

[26] "In any private action arising under this chapter, the plaintiff shall have the burden of
proving that the act or omission of the defendant alleged to violate this chapter caused the loss
for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).

[27] Dura was decided after the parties briefed the instant motions.  However, Dura did not
change the standard followed by this Circuit, and indeed explicitly upheld the notion of
proximate causation set forth in Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000).
Dura, 125 Sct. at 1633.  As such, Plaintiffs were aware of the necessity to plead economic loss
and proximate causation.

[28]     As to Tellium, Carr, Losch and Barcus, Plaintiffs allege: "As a result of the
dissemination of the materially false and misleading information and failure to
disclose material facts, the IPO was consummated and the market price of
Tellium's common stock was artificially inflated during the Class Period. In
ignorance of the fact that the market price of Tellium's shares was artificially
inflated, and relying directly or indirectly on the false and misleading statements
made by defendants or upon the integrity of the market in which the securities
trade, and/or on the absence of material adverse information that was known to or
recklessly disregarded by defendants but not disclosed in public statements by
defendants during the Class Period, Plaintiffs and members of the Class acquired
Tellium common stock during the Class Period at artificially high prices based on
their reliance and were damaged thereby....
At the time defendants disseminated the misrepresentations and omissions
complained of herein, Plaintiffs and other members of the Class were unaware of
their falsity, and believed them to be true. Had Plaintiffs and members of the
Class and the marketplace known of the true customer relationships and prospects
of Tellium, which were misrepresented and not disclosed by defendants, Plaintiffs
and members of the Class would not have purchased or otherwise acquired their
Tellium shares during the Class Period, or, if they had acquired such shares during
the Class Period, they would not have purchased them at the artificially inflated
prices which they paid."  ¶¶ 170-171.

using almost exactly the same language were insufficient to support loss causation. Id. at 1630 ("In reliance on the integrity of the market, [the plaintiffs] ... paid artificially inflated prices for Dura securities" and the plaintiff suffered "damage[s]" thereby.").

In contrast to the plaintiffs in Dura, who made no attempt to allege that the share price fell significantly after the truth became known, Plaintiffs here do allege that the share price fell as major disclosures were made regarding Tellium's prospects. Plaintiffs allege that on February 1, 2002, the day after Carr held a conference call with analysts in which he conceded that Tellium needed a new customer in order to achieve its $288 million revenue guidance, Tellium's stock dropped 14%. ¶ 125. Plaintiffs further allege that on June 25, 2002, the day after after Tellium announced a "business restructuring" including a layoff of 200 of its 530 employees, Tellium's

---

As to TWP, Plaintiffs allege:
As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the market price of Tellium's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Tellium's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by this defendant or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by this defendant but not disclosed in public statements by this defendant during the Class Period, Plaintiffs and members of the Class acquired Tellium common stock during the Class Period at artificially high prices based on their reliance and were damaged thereby....
At the time this defendant disseminated the misrepresentations and omissions complained of herein, Plaintiffs and other members of the Class were unaware of their falsity, and believed them to be true. Had Plaintiffs and members of the Class and the marketplace known of the true customer relationships and prospects of Tellium, which were misrepresented and not disclosed by this defendant, Plaintiffs and members of the Class would not have purchased or otherwise acquired their Tellium shares during the Class Period, or, if they had acquired such shares during the Class Period, they would not have purchased them at the artificially inflated prices which they paid. ¶¶ 178-179.

stock dropped to $0.87 at closing.  ¶ 127.  Three days later, Tellium disclosed that its second-quarter revenues would be only $3 million.  ¶ 127.  On July 1, 2002, the last day of the class period and the first trading day following Tellium's June 28, 2002 announcement, Tellium's stock price closed at $0.65. ¶ 128.  In the March 31 Opinion, the Court pointed out that, upon amendment of the pleadings, it would consider whether Plaintiffs had adequately pled that, *inter alia*, the clear drop in the price of Tellium stock following the January 31, 2002 conference call proximately caused a decline in the value of Tellium stock.  Plaintiffs made no attempt to address the Court's directive, having added no additional allegations in the SAC that address the loss suffered, or the causal connection.

The Dura court held that a when a stock price falls, the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  Thus, the Court held that plaintiffs must allege that they have suffered "actual economic loss," id. at 1632, and that private securities fraud actions are permitted only where "plaintiffs adequately allege and prove the traditional elements of causation and loss." Id. at 1634.  "[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide an defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  Id. at 1635.

The Court finds that Plaintiffs have not alleged that the economic loss suffered by Plaintiffs, or that the misrepresentations of any of the Defendants proximately caused the lower price of Tellium's stock, as opposed to the "uncommonly severe decline in stock prices across all sectors of the U.S. economy and in the telecommunications sector in particular during the Class

Period."  TWP Brief at 15.  Instead, Plaintiffs hinge their loss causation allegation on the idea that

"where the claimed loss involves the purchase of a security at a price that is inflated due to an

alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged

misrepresentation to satisfy the loss causation requirement."  Pl. Opp. Br. at 46.  Plaintiffs have

failed to state a claim for a violation of  § 10(b) and Rule 10b-5 because of their failure to properly

allege economic loss and loss causation.[29]

Because Plaintiffs have not adequately pled loss causation, Counts IV and V of the SAC are

dismissed.  Because Plaintiffs fail to adequately plead an actionable predicate violation of § 10(b)

or Rule 10b-5, Plaintiffs' Count VI claim for "control person" liability under § 20(a) must also be

dismissed.  Shapiro, 964 F.2d at 279.

---

[29]Because the Court is not dismissing certain of the § 11 claims in the instant action, this
decision is not a "final adjudication of the action" and the Rule 11 sanctions analysis required by
the PSLRA is not required at this juncture.  15 U.S.C. § 78u-4(c)(1).

**IV.    CONCLUSION**

The Court denies in part Defendants' Motions to Dismiss Count I of the SAC, but only with regard to the nature of the relationship between Tellium and Qwest.  The Court denies the Tellium Defendants' Motion to Dismiss Count II of the SAC as to Carr, but only with regard to the nature of the relationship between Tellium and Qwest, and grants the Motion as to Losch and Barcus with prejudice.  The Court denies Tellium Defendants' Motion to Dismiss Count III as to Carr, and grants the Motion as to Losch and Barcus with prejudice.  The court grants the TWP and Tellium Defendants' Motions to Dismiss Counts IV, V, and VI of the SAC with prejudice.

Dated: June 30, 2005                                          /s/ Freda L. Wolfson
                                                             The Honorable Freda L. Wolfson
                                                             United States District Judge